May it please the Court. My name is John Arbab. I'm from the Department of Justice on behalf of the United States. The issue here is whether the District Court – Can I just ask you at the outset, what would be the actual – what would you lose by having this individual who had done many investigations testify just as an ordinary fact witness rather than as an expert? Would you really lose anything? Your Honor, I think the government has good reasons for wanting a particular individual. I understand, but what would you lose in the long run if this case – if it goes to trial? He would not be able to offer any expert opinions on any of the points of evidence and issues that – You couldn't convict beyond reasonable doubt? I'm sorry, Your Honor? You couldn't convict beyond reasonable doubt without an expert opinion? I don't – I really can't say, Your Honor, but I think the fact that the government wants to use an expert in this case means that the government does believe that these sorts of ship operations are beyond the ken of jurors to understand without – Clearly you believe it, and it's a very plausible belief, but Judge Padova wrote a very strong opinion as to why, under Pineda and others, that he should not be considered as an expert. My question to you is a practical matter, as supplemented by Judge Randell. What do you really lose? Your Honor, there's always a great deal that's lost when an expert can't testify, qua expert. Isn't this person sort of like a police officer who's done – you know, showed up on the scene of many – a crime investigation? This person here has done thousands of investigations. Now, whether he's an expert or he's a guy that's particularly knowledgeable as an investigator, as a fact witness, I'm not so sure I see why you have to win on expert, because at this point it looks to me like you're climbing up San Juan Hill. Your Honor, I don't believe that we're climbing up San Juan Hill at all. I understand that the standard of review is abuse of discretion, but I think in the briefs we've made it quite clear that the district judge did not apply the correct legal standards in excluding this evidence. How come? There has to be a reliable methodology, peer review, a scientific method. He really talks about inferences that he drew from facts that are just the same as a jury could draw. I mean, you're almost saying that the investigator that Judge Amber refers to, that we should have investigators and detectives be allowed to opine that someone committed this crime, because this and this and this and this and this. The expert opinion is they committed a crime. That's really what this is. Your Honor, first of all, there doesn't have to be scientific testimony. That was the previous position. But what's reliable and peer review? Your Honor, those are all things that may be relevant if, for example, we had a nuclear physicist who wanted to testify. But here we have, as Your Honors have suggested, someone more along the lines of a police officer who has a great deal of practical experience. Police officers are routinely allowed to testify as experts, and they give very powerful evidence about what circumstances, whether they add up to criminal conduct or not. And there's no reason to make a different sort of distinction between a police officer investigation and a maritime pollution investigator. A police officer makes the ultimate, gets an opinion, admitted to the jury that this person committed this crime based upon their investigation? Is that correct? Yes, the testimony does not go to the mental state of the defendant, which is also an issue here. The felony has to be knowingly committed. Chief Jones can't testify about that. But just like a police officer, he can testify. He can testify that they were the person that robbed. Based upon this, I conclude my expert opinion is this is the person who broke toward down this door and walked in and took this jewelry. Are we really allowing jurors to have expert opinions in criminal trials to that effect? Your Honor, it's just like a police officer who says that the transaction I witnessed is, based on my experience, is consistent with criminal distribution of heroin or drugs rather than the innocent explanation that's offered by the defense. I don't think it goes that far. Well, that example you gave, that's the Davis case, right, where this court permitted an expert opinion of the type that you're describing. How is this case like the Davis case? In the Davis case, the opinion offered and upheld by this court was that the behavior of the defendant was consistent with an intent to distribute. Here you're looking at a case where the circumstantial evidence that the – I don't know whether Mr. Jones has a specific title that I should be using. His title is Marine Science Chief Technician. That's why he's referred to in the record as Chief Jones. Chief Jones it is. So Chief Jones sees some oil in a hose. He sees some evidence and hears some people say that there's something about the ballast system that indicates that there's been a discharge of oily waste. But what is the – how is what he concludes from that, peculiarly within an area where we would say, oh, that's expertise? Like in the Davis case, it's I'm not a drug dealer. Average jurors aren't drug dealers. So the behavior that the police officer has seen repeatedly is something that we allow an officer to opine about and say those sort of – those circumstances, hand motions, hand-to-hand passing of stuff, the amount, the quantities, et cetera, this is consistent. What is it about this case that's analogous to that and would allow us to say, well, Chief Jones can do more than say, I found an oily substance in this hose that was secreted under the floorboards, but can say, and I conclude there was a discharge. Your Honor, the – this case is like – is akin to police investigator cases. It's akin to this Court's opinion in Pineda involving expert testimony, akin to the Court's opinion in the Schneider case. In each instance, you have a situation that average jurors cannot make their way through the evidence without having an expert connect the dots for them, as it were. And here you have very complicated ship records. You have physical evidence that was examined by an expert investigator. He tries to come up with the best inference that he can about what happened to the oily waste on the ship on the dates in question. If you just – if you just put these records with fact witness type testimony in front of a jury, the jury is not likely to be able to intelligently understand the evidence that's being put before them. And, you know, this sounding – what does this sounding mean? It means X. It means it was less today than it was yesterday. What does this mean? And what does this mean? And then the jury puts two and two together, and, I mean, his opinion basically is it had to go somewhere. And he literally says that. It didn't go to a receptacle, and the crew didn't have answers. The crew didn't have – they didn't give explanations. From those two things, he decides that it went overboard, acknowledging that he didn't look for other tanks. I mean, couldn't a jury really have the same kind of light bulb? Okay, I understand what the sounding means. I understand it wasn't there. I understand it wasn't there. It wasn't there. And the jury says, well, we've eliminated every possible way it was, placed where it could be, if you did, and then reached that conclusion. Or the jury's, in your words, reasoning to the best inference. Yes, Your Honor. That's what juries do. That isn't necessarily what you have to have an expert for. There's – but so long as the expert witness meets the requirements of Rule 702, there's nothing that says the government can't use that kind of person as an expert. But what the court said was on the second, on the science – I mean, yes, he had the experience. But on the science part, he really – he was an investigator is what the court said. Isn't that right? Your Honor, there isn't really science with a capital S in this question. What the district judge says was Chief Jones was using an unused or otherwise untested, I believe, methodology. But that's just not correct. I mean, the evidence makes it clear that what he was doing was reasoning to the best inference, the same way that expert opinion has been allowed in other cases based on the same kind of reasoning process. But what the court eventually focused on were his investigative methods, not just his experience. Yes, Your Honor. And what's so expert about his investigative methods. It's what I could be trained to do, even though I'm not an expert, if somebody told me what to do in a manual. You go in. You listen to what Singh tells you. You go in. He points out where the stuff – the hose is. You see if the hose fits into the oil. And then you go and try to figure out if it could be somewhere else. With regards to the bilge ballast, you try to figure out what happened there. But, again, that's all, quote, reasoning to the best inference, like a jury would do that. Your Honor, I think – That's what investigators do. I wouldn't want to be sitting on the jury trying to figure out all this stuff. I mean, if you look in the volume four of the appendix, you see some of the records that Chief Jones had based his – All kidding aside, I've seen denser episodes of Perry Mason. Your Honor, the ultimate question here is, does this individual meet the requirements of Rule 702? If he does, the government is entitled to have him testify as an expert. So where was the abuse of discretion? Let's go back to that question. What was – you say the judge applied the wrong legal standard. Be very precise. Where did Judge Padova's steps arrive? The first – well, one of the errors was not considering Chief Jones's qualifications in determining that his testimony was unreliable. The second error was in failing to recognize, as the government argued below, that the methodology with a small m that Chief Jones was trying to use was reasoning to the best inference, which is akin to the differential diagnosis that this Court has said many times is a reliable way for an expert to reach an opinion in the medical field. In differential diagnosis, there is a – I was a little surprised that you took that argument, because in a differential diagnosis, you know that the patient is sick, so you're trying to figure out what's going on, right? You can't assume there's a crime, can you? No, but we're trying to find out – How is this like differential diagnosis, unless you're prepared to assume there's a crime, which is something you really can't do? Your Honor, it's like differential diagnosis because there are – as the defense has hypothesized, there are any number of potential explanations for the drop in oil, as reflected in the records on the two dates in question. The differential – Did he acknowledge, Chief Jones, that there are explanations that I didn't look at, I didn't consider? No, Your Honor. Going into another tank? All of the explanations that the defense threw at him, as we detail, especially in the reply brief, were answered by Chief Jones at the hearing. And again, the standard is not whether – is not one of correctness. Did Chief Jones' ultimate opinion have to be correct to be admissible? It's just that he had to identify – I'm not trying to get to whether it was correct or not. I'm trying to test your assertion that this is like differential diagnosis. It's not that he answered things in the hearing. The question I've got is, did he behave like a doctor does, doing differential diagnosis while he was investigating? That he may have thought of things to say in the courtroom under questioning is not the same as saying he engaged in differential diagnosis of seeing alternative hypotheses and setting out to prove or disprove them. Yes, Your Honor. I think that, if I could refer you to Chief Jones' own words, he said that in doing his investigation he considered a number of pieces to the puzzle and he ruled out, to the best of my ability, other alternative choices or possibilities. That's at Appendix 369 and 523. I think that encapsulates differential diagnosis or reasoning to the best inference. For all the reasons we've detailed, there was no reason for the district court to keep this proffered expert testimony out. Thank you, Your Honors. Carl Woodward of the firm of Carrella, Byrne & Roseland. On behalf of the appellee, Yevgeny Diachenko, as this court, I think, is aware, I'm going to be taking eight minutes of our time to talk about the approach to differential diagnosis. in this matter, and then my colleague, Mark Greenberg, will be dealing with the differential diagnosis issues. Why don't you just, then, perhaps you can focus on the second Dalbert problem. Well, with respect to Dalbert, what we have here, Your Honor, and particularly under Rule 702, qualifications, reliability, and fit. Judge Padova, in dealing with this issue, under the, and just to give you some background, was enormously familiar with this case. He had heard, as I have counted, multiple motions, perhaps as many as 19. He had made numerous rulings on law regarding this matter. He was fully conversant with the facts and the law. In terms of this hearing alone, he had three days of testimony from Chief Jones. He was intimately involved. If you've looked at the transcript, you have seen his examination of Chief Jones. The question, in looking at the Paoli standards, and in his decision, by the way, he not only cites Rule 702, but he also gives you an analysis of Paoli, talks about Paoli and the issues that are required there. He goes through all of them, with the exception of the issue of qualifications, which the government deals with. We submit that, under the circumstances, he did consider his qualifications, simply because he talks about them in the beginning, and then he has to take, throughout his opinion, discuss what he knows and what he thought about. Mr. Woodward, you seem to take the position that the qualifications here had to involve publishing scientific articles, having a series of initials after names to show higher education. I mean, that's the language of your brief. Quote, Jones, this is page 50, Jones has never been qualified as an expert, never published any scholarly or peer-reviewed papers on any topic, does not possess any formal degrees, not a member of any professional society or association. I mean, doesn't that kind of approach that you're urging on us take Kumho tire and just toss it right out the window? Well, I think the important thing, and certainly, I'm not saying, and we don't mean to say, because, of course, the judge did not get to that point, because he said in his decision, he said, because I find this opinion is not reliable, I am not going to decide directly the issue of his qualifications per se, as we see under Paoli. Which is why I ask you maybe just to start at prong two, rather than prong one. Prong one is, is he qualified as an expert? You seem to be a stronger argument. This person, I think, is a good argument. He could qualify as an expert. I think you could. But the question there is, then becomes, was what he testified to such scientific, technical, or specialized knowledge as to be reliable? To deal first with the question of whether he's published anything or not, we acknowledge the fact that an expert witness doesn't have to have done that. Car mechanics can testify as expert witnesses. We know that by virtue of training. But the fact is, they have a particular way in which they look at or analyze a particular problem. When asked by Judge Padova what it was specifically that his methodology was, he really couldn't describe it. What he did was he said that he had met Gopal Singh on the dock. The man had been fired. He knew that he could get a reward for turning in evidence of illegal discharges. He knew that the man had, and that one of the things that he told Jones was the fact that, you know, he was fired because he wouldn't pump overboard. And yet, what does he do? He goes on the ship. He takes him down to the engine room. And he leads the investigation. He shows him the hose. He does all those things. And Jones, in his testimony, and Judge Padova asked him that. You're shocked that the informant would be somebody that the authorities would rely on to show him where evidence of the crime was? Not at all, Your Honor. I would expect that sort of thing. What I'm saying, though, is Jones is acting as an investigator at the beginning. First and always, he's an investigator. He doesn't become an expert witness until much later. For example, did he write down anything that he said? Did he write down a report, how he conducted his investigation? He didn't do that. How is this different from the cop? Let's use your opponent's example, if we can, Mr. Woodward. He says, this is like a beat cop who witnesses a drug transaction and comes into court and says, yeah, when I see this happening, that tells me I've got a drug buy going down right there in front of me. How is Chief Jones, 800 investigations, three years of experience on a Coast Guard cutter, specialized training in the field, how is his going around the boat and looking at the evidence different from the cop who sees the drug buy? Because he was presented, among other things, with a whole variety of a ship. I've been on them not before a few years ago. They are very, very complicated pieces of machinery. Just take the hose, for example. The hose runs from the sludge pump, according to Mr. Singh, to the boiler blowdown overboard. Well, the hose is 20, 30 meters long. It's a long hose. There are many places that it could go. And yet Chief Jones didn't try to find out whether any other place could have fit that particular hose. He didn't do that. He didn't. Is that a basis for you to attack somebody on cross-examination or is that a basis to keep them out of court altogether? Well, I think Judge Padova, when you look at all of it, all of it, and he looks at the methodology that he follows, Judge Padova concludes that there is no methodology. The opinion is not reliable. And sure, if I let it in, it's certainly going to be the subject of cross-examination. But it's so poor, it's so unreliable that it doesn't cross the threshold. It doesn't get across the door and shouldn't come in. Because, as Judge Padova, at the end of his opinion, says, and you picked up on it, he basically says that Jones is basically trying to tell the jury, excuse me, in his opinion, in essence, simply tells the jury what result to reach based only on the factors that he considered without reference to a host of other ignored circumstances. Such reasoning lacks the intellectual rigor that should characterize an expert's opinion. Now, whether it's someone who is an astrophysicist or whether it's someone who is a car mechanic, it's the same thing. And here it wasn't there. Okay. You say it's the same thing. Then let's go to the Davis case again. Are you suggesting that for police officers to be able to testify in court with respect to drug transactions, that they have to write down all alternative scenarios and give a description of each and their investigation of them and why they don't think they're, in fact, those other alternatives before they can come into court and say, this is what I saw. It's consistent with drug transaction. My expertise tells me, my experience tells me that's what it was. Well, yeah, and what you have there is an officer, you know, you wouldn't have a fellow just out of police academy doing that. What you have is someone who has many, many years of experience. This guy's done 8,000 investigations. 800 investigations. 300, I'm sorry. He's done 800 investigations, but only 10 have involved, according to him, the issue of oily water separators. And he's never testified in court before. He's never been subjected to. Every expert's got their first time in court, right? There's no question about it, Your Honor, and I certainly understand that. I have made that argument many times myself. However, under the circumstance, the expert still has to have a methodology, and he could not articulate the methodology that he used. My time is up. Thank you. May it please the Court. We split up our argument here, and I'd like to touch upon this differential diagnosis. And the first point to make is that this whole argument of differential diagnosis was an afterthought. It's not in their briefs in the lower court. It shows up after everything's closed, all the testimony's closed, and the Court allows us to file proposed findings of fact, conclusions of law. The Court at page 540 in the docket says nothing more than eight pages. On page 16 in a brief, not proposed findings of fact and conclusions of law, they mention the differential diagnosis. Now, the differential diagnosis is a doctor looking at symptoms and saying, well, it could be a cold, it could be sinus infection, it could be sinus medicine abuse, it could be lung cancer, and let's look at all of these and investigate what it will be. The situation we have here is that Jones disregarded the cancer, disregarded the flu, and just said, I'm going to take a look at it. I'm not going to look at those things. I'm going to say it's a cold because I've got somebody telling me it's a cold. Jones took no notes. Now, this isn't a police officer saying, I've seen a drug transaction thousands of times, and they do it this way, and this is just one more time in that moment, instant of time. He's spending his entire day investigating this allegation to try to corroborate, to validate Gopal Singh. And does he take any notes? No. There's no notes of what he did, so he can't explain to Judge Padova what he did. I don't know sitting here, but you could tell me whether or not he took contemporaneous notes, but I did see that there was a very lengthy chronology over several single-spaced pages where he described step-by-step, this is what happened, this is what happened, this is what happened, this is what happened, this is what happened, taking you through from the time he meets Singh, through his discussions with other people, and walking around the boat and doing all those things. That doesn't strike you as some effort by a professional investigator to document the investigation that was undertaken? Your Honor, the disturbing part is that on the ship he's interviewing foreign crew members that barely speak English, takes no notes. Mr. Ney takes notes, but those notes are destroyed. And so even the soundings that Chief Jones took of the tanks, he has to just have them from memory. There's no notes because Ney destroys his notes. He's told about internal transfers, and he testifies that, oh, yeah, you know what, between the first day of testimony and the second day he figured out there's yet another internal transfer that took place. And he has no explanation other than to tell the court, yes, I should have looked, and yes, if they needed to put it somewhere, 11th Center Tank would have been an appropriate place to put it. He didn't investigate sabotage. He was told that sabotage would make sense, and in testimony he actually said that it would be consistent with sabotage in that when they left port, given where the oil was in the bilge ballast system, when they were going to leave port and Singh would be on a plane going home, they were going to cause an oil spill when they did their ballast exchange. So they were going to cause, they were set up to cause an oil spill. He acknowledged that in his testimony, but he didn't acknowledge it in his report. He didn't analyze it. He didn't consider that maybe that's, maybe they're right. Maybe it's a sabotage. His analysis, his methodology didn't catch that Gopal Singh lied in his written statement. In a written statement he says, I remember that it went from, the tank went from 90 centimeters down to 16 centimeters when we were at sea. One day it was 90, the next day it came on it was 16, and that proves that they were dumping in the ocean. And Chief Jones admitted, excerpt page 320 to 322, the ship was in port. It's a lie. But he didn't figure out the lie. I have to assume he did not figure out the lie before on that stand because certainly that would have had been included in a report. Certainly that's exculpatory. He never admits it. Until he's on the stand, he now knows Gopal Singh lied about that, yet his analysis doesn't change. And the court questioned him on several of these things. Why didn't you look? I just didn't look. Would it have been a good practice to look? Yes. And the other point that's really important I think here is that if you look at docket number 201, it's the court's first ruling about the expert reports. If you have a methodology and the methodology is reliable, each time you apply it to the fact, you should get the same answer. The bill of particulars had 25 dates of discharge. August 8th, he's had all this time. He's down to eight days of discharge. He then comes up with a report December 10th. He now is back to 23 dates of discharge. And the court in its ruling on that motion, what is it, 201, the difference between the August 8th report and the December 11th report, I think it's December 10th, are substantial. And goes on to state that dates matter. This is a case where the dates matter. Whether it happened on this date or that date, all the information on the ship, all the soundings, everything is different day by day. And in the footnote three, we asked the government to explain why dates in the December 11th report were not in the bill of particulars. The government was unable to do so. It has no explanation for why this methodology, every time it gets applied, comes up with a different set of answers. Two plus two, every time you add it up, it should be the same. But he had three different answers with the same methodology. Now, does your argument assume, Mr. Greenberg, that investigating is akin to math? I mean, isn't it possible that you can have and do have circumstances where, let's use the car mechanic example you used, where a car mechanic listens to a noise, I think it's this, goes in and tries to figure out what it is. Uses the same methodology but comes up with a different answer the next day because, you know, that's the way it is when you're trying to diagnose a mechanical problem as opposed to figure out a math sum. If you go in the second time to look at the car and you learn something new, then yes, your analysis, your answer may be different. But if you find the exact same information you found yesterday, what is the basis for the change of opinion and what is the reliability? And that's what the court is looking at is what is the reliability of this methodology? And the court asked everyone in the courtroom about that. Excerpt page 485. We're talking about investigating the variables, the court says. We have to look at this. So where did the volume change and what was the cause? Three steps. What is the method with respect to that? Mr. Walsh, I agree. The court, government, Ms. Burns, yes, Your Honor. There was no question. That's what we were looking at. The court did have a methodology. The court had a very methodical, analytical view of how to take a look at this testimony and whether or not to accept it. When you look through that transcript, you'll see question after question by the court, and the court's talking about trim and balance. The court figured it out. The court understood the pointy end from the not-so-pointy end of that ship and was very careful and very analytical. It waited months to get the actual transcript from the hearing before rendering that memorandum opinion. It cites to his experience. It cites the Paoli seven times. The court knew the standard and applied it very well in a very considered opinion. And what we know from Kumho Tyer is the abuse of discretion standard not only applies to the opinion, the decision of the court, it actually applies as well to the methodology the court uses. And as long as there is a methodology, and there clearly was in this case with this judge, that it is an abuse of discretion standard. Counsel, do we know, I mean, his opinion says that he has, he's part of a program that was initiated to eliminate safety and environmental threats posed by substandard merchant vessels operating in waters, et cetera. And then he says, I have investigated allegations associated with illegal discharges. Do we know of the level of experience? I mean, do we know even if he said, I have, and he really doesn't say, I have seen this routinely, and when I see this, it means X. Do we know his background in terms of drawing conclusions from facts of this kind and investigations of this kind? We don't, Your Honor. We only know that he has claimed to have been involved in 10 MARPOL, which would be oil-involved investigations, one of which we know from the testimony, there was a whistleblower and it turned out to be a lie. We don't know anything about the rest of the cases. We don't know his level of involvement. Clearly he wasn't a testifying expert in them. His other investigations may be, I mean, they go on and they check whether the lifeboat has a hole in it. So there's lots of safety investigations. It's not a MARPOL. It doesn't go on every ship looking to see are they dumping overboard. It's really when you have, in this case, a disgruntled employee that's been fired who makes allegations, he goes on to see and try to corroborate those allegations because at some point, and what I think this Court recognized early on in the discussion with the government, he's really there to vouch for Gopal Singh and replace the jury because it is, at the end of the day, his testimony is, I know when I see it and I think I see it here, so trust me, this was dumping. This wasn't something else. And that truly is the jury's providence. That's what the jury is there to answer and look at these facts. Presumably he's on a fact-finding mission. He is there to take a look at what Gopal Singh says there's a hose. Well, he finds a hose. Great, there's a hose. He doesn't investigate, though. He doesn't, as an expert, if you were going on as an expert and not an investigator trying to make a case, an expert would look at all those possibilities just like you would want your doctor to and not simply say it's not cancer because I'm not a cancer doctor. Don't we have experts all the time who are investigators? I mean, that is the model of the police officer. The police officer isn't out there saying, today I'm going to be an expert. The police officer is out there saying, today I'm going to investigate crime. At some point, if there's a crime detected and that officer is called, the police officer is asked, not infrequently, what does your training and your experience tell you about these things that you discovered in the course of your investigation? And as a matter of ordinary, every day going on in courtrooms all over the United States of America, they're saying, well, this is what I think it means based on my, you know, take the expert out of it. Let's call it opinion testimony. They're given opinion testimony all the time based on their training and expertise and the things they've investigated. Why do you need to make the pitch that he should have gone on with an expert hat on as opposed to an investigator's hat on? Because the case law is you still need a reasonable, reliable methodology, even if you are a very smart fellow and well-educated in ships. You still need a reasoned methodology if you're going to stand in front of a jury and say, ladies and gentlemen, trust me, they dumped overboard because I analyzed everything, I looked at every other possibility, and this is the right answer. He can still do that as a fact witness, can't he not? The government could still argue it in their argument to the jury, make those arguments based on whatever fact witness is permitted. Yeah, of course, you can't make the conclusion that it's an expert. Yes. More to the point, though, if this goes back without him being qualified as an expert, isn't it sure as the sun rises in the east, Mr. Greenberg, that when a question comes up, or even if a question doesn't come up, but Chief Jones says in his answer, well, you know, I saw that and that oily sludge in there, and I think it's because they hooked it up to that thing and dumped overboard that you'll be jumping up saying, wait, that's an opinion and he can't offer that. That's correct. When it goes from I found it and it was here and here's the photograph of what I found and steps over to and I believe that they then dump that overboard, as soon as it's I believe, you're right. I think then there's an objection and he's gone beyond. Not even if it gets to I believe it went overboard. Anytime he's going to draw an inference, you're going to be objecting, aren't you, saying he can't say what he believes. That's his opinion, right? Because he's going beyond a fact witness. Right. So it's not just a matter of, well, he can't say it went overboard. You'll be objecting to any word out of his mouth that involves inference and not a direct statement of what he observed, correct? That's the difference between a fact witness and an expert opinion, yes. Just so we're real clear on that. And I think the court is very clear on that. It did not exclude him as a witness in total. Thank you, Mr. Greenberg. Thank you. May it please the Court. Could I? I'd like to respond to a number of comments that were made by defense counsel. First of all, on the bill of particulars, there's nothing in the response brief that makes a bill of particulars type of argument. There's nothing cited by the district court that keeps out this testimony based on some bill of particulars argument. The district judge did lay out in his opinion the appropriate standards, but then proceeded to misapply the standards for the reasons we've briefed at some length. Mr. Greenberg referred to all those possibilities that Chief Jones supposedly did not look into. Well, he was asked for almost three days on cross-examination about all the possibilities the defense could think of. He offered reasonable rejoinders to all of those as we detail in the reply brief, and that is all he needed to do. He just needed to offer a decent explanation about why those other possibilities didn't make sense in order for his testimony to be admissible. He didn't have to disprove those others. If this case goes forward, there are people out there that could qualify as an expert, are there not? I don't know that, Your Honor. I do believe that it's beyond the cutoff date for the designation of expert witnesses according to the scheduling of the district court. I would remind the court that there's a liberal standard of admissibility. The court has said that repeatedly in respect to expert testimony. Again, Chief Jones adequately offered reasonable rejoinders to everything that he was asked on cross-examination in regard to supposed other alternative explanations for what happened, including the so-called other tanks argument, which we deal with almost ad nauseum, including the 11th Center tank explanation in the reply brief. The notion of sabotage was adequately handled by Chief Jones when the chief engineer mentioned sabotage, but then gets up and walks out of the room. What else can Chief Jones do? Because you're saying we can come up with good explanations now. What I hear your opponent saying is that's not what this is about. It's about whether you went about this in a professional and even-handed way to begin with, and you didn't. So all the reasons you can come up with after the fact for why alternative explanations don't work, don't make what you did in the first instance more reliable, I take that to be their argument, and I think that's the argument you should be responding to. So it's your opinion that large volumes of oily waste were discharged overboard while the ship was at sea, correct? Yes. Okay. What is the basis for that opinion? Reviewing the oil record book, the tank sounding log, the bridge log, and you know, the receipts, that there wasn't anything that was discharged to a reception facility. That's number one. And then the other thing that helped me determine that, too, was I asked questions of the captain and the chief engineer and everything of why the tank levels dropped during those days, and they didn't have an explanation for me. And he stops. He was asked for the basis of his opinion, and he says, you know, they weren't in port, so it didn't go there, and nobody else had an explanation. So that's why I concluded that oily waste was discharged. I mean, is that a methodology? Your Honor, yes. It's what an investigator does trying to use reasoning to the best inference. Well, he said, you know, from my experience, I conclude that any time, you know, people don't have an answer and any time they don't put it in a reception facility, I know they don't put it in other tanks. I know any time I see, you know, oil there, I know from the 20 investigations that this is where it goes. But he didn't say that. He nowhere says, like the Davis situation, like I've conducted these investigations. I know this when I see it because I've done it before. He doesn't say that. Your Honor, there was testimony about his experience. There was testimony about whether or not these documents that he reviewed in this instance are the same types of documents that he reviews in all of his other maritime investigations, which the answer was yes. It's a 2 plus 2. I have experience. I've seen it before, and this is – it went overboard because, you know, 99 times out of 100, when I see this and I see this and I see this, guess what? That's what's going on. And we don't have that. Your Honor, it doesn't have to be 99 times out of 100. It has to be. It doesn't even say 80. It has to – the clear import of his testimony is I reviewed these objective pieces of evidence. I asked for explanations of the crew. None of this added up. And whenever I was given an alternative explanation, I could see that that didn't make any sense either. And that's all that you have to do to have an admissible piece of opinion testimony under Rule 702. The solution for this problem, if it is a problem, is cross-examination at trial or the introduction of contrary expert testimony. But it's not to keep the evidence out altogether, especially not when the district judge is not applying the correct legal standards when he decides to keep the evidence out. Thank you. Thank you. The case is well presented. We'll take it under advisement. Ask the clerk to recess for a moment.